Present: Carrico, C.J., Compton, Stephenson, Lacy, Keenan,
and Koontz, JJ., and Whiting, Senior Justice

JEFFREY C. TUOMALA, ET AL.

v. Record No. 952286    OPINION BY JUSTICE BARBARA MILANO KEENAN
                                            November 1, 1996
REGENT UNIVERSITY

FROM THE CIRCUIT COURT OF THE CITY OF VIRGINIA BEACH
Edward W. Hanson, Jr., Judge


The primary issue in this appeal is whether an employer's
refusal to renew an employment contract under its original terms
constituted a breach of contract.

Three professors at Regent University (Regent), Jeffrey C.
Tuomala, Elaine Shouse Waller, and Clifford W. Kelly
(collectively, the professors), filed declaratory judgment suits
seeking a determination of rights under their faculty contracts.
The professors alleged that their contracts entitled them to
permanent tenured employment at Regent and requested the trial
court to declare that (1) they were entitled to a renewal of the
exact terms of their three-year continuing contracts, and (2)
they could not be dismissed from their positions as tenured
professors at Regent unless they were in breach of their
contracts, or unless the schools in which they taught were
discontinued.  The professors also alleged under an estoppel
theory that they were entitled to annual renewal of their
contracts because they had reasonably relied to their detriment
on tenure policy statements made by Regent's agents.

The suits were consolidated and the trial court heard
evidence in a seven-day bench trial.  The evidence showed that
each of the three professors had signed a faculty contract for

the 1993-94 academic year (faculty contracts).  These contracts were signed by the president, the provost, and the dean of the respective school in which each professor taught.

The provisions in dispute relate to the interpretation of the contract phrase, "three-year continuing contract."  These provisions are set forth below.

The contracts each stated:
> This three-year continuing contract is subject to the policies and procedures governing such contracts as set forth in the [f]aculty [h]andbook effective August 1992.

The preface to the faculty handbook stated:

> The [f]aculty [h]andbook contains the major policies and procedures that govern the academic affairs and some of the administrative affairs of the university. Our policies are under continuous review and subject to change without notice.

Other handbook provisions stated:

> Tenure -- Continuing Contract
>
> Annual Entitlement.  A person who has received an appointment under a continuing contract is annually entitled to a new contract unless he is found by the university to have breached his contract or unless the school or academic program in which he is employed has been discontinued.
>
> * * *
>
> Annual Review
>
> Annually, a faculty member is offered a new contract consistent with the above policies and procedures.  It supersedes the previous contract which may have a remaining term of one or, in some cases, two years. The second year, and in some cases the third year, of both the provisional and continuing contract are, by design, never expected to be binding on the parties except under the conditions, as follows:  one or both parties choose not to offer or to accept a new

employment contract.  The second year, and in some cases the third year, therefore, are designed to insure that the employee is employed for one, or in some cases, two or more years so that he can find other work without economic hardship.[1]

Regent adopted a new policy in the 1994-95 academic year, under which it offered each of the professors a new contract. The contracts did not include the term, "three-year continuing contract," but instead provided a "tenured faculty appointment" for one year, subject to "tenure review" during the following academic year.  The professors did not sign the new contracts based on their belief that the new "tenure" policy significantly reduced or eliminated their contractual rights as set forth in the faculty handbook.

The professors introduced evidence showing that in 1989, during the process of securing full accreditation for the Regent Law School, Herbert W. Titus, then the Dean of the Law School, received a letter from the American Bar Association (ABA) site team questioning whether Regent provided tenured contracts to its faculty.  Robert G. Slosser, who was then Regent's president, submitted a response attempting to clarify Regent's policy.  As part of the response, Slosser explained paragraph 6 of the faculty handbook by noting that this paragraph

was not written in derogation of the guaranteed annual three-year contract, as the explicit proviso to that section clearly states.  In other words, this provision

_____

[1]This section of the handbook was referred to throughout litigation as "paragraph 6."

does not allow the University to substitute a decision not to offer a new employment contract inconsistent with its annual obligation to offer such contract to any faculty whose appointment is on a three-year continuing contract.

The professors also presented evidence that during ABA hearings, Titus stated that a "tenured" professor was entitled annually to receive a new three-year contract unless he was found to be in breach of the contract, or the program in which he taught was discontinued. In addition, in a 1990 response to an ABA site team report, Titus referred to Slosser's letter as the "authoritative interpretation and written commitment regarding the University's tenure system."

M.G. Robertson, Regent's chancellor, testified that Regent's Board of Directors always had been opposed to the concept of permanent tenured employment. He stated that the Board was unaware of the Slosser letter until late 1993, and that had he and the Board known of the representations made to the ABA, they "would have shut the law school down."

Robertson also confirmed the policy stated in the faculty handbook that the entire power to set university policy is vested in the Board. Robertson stated that the president's function is to carry out the Board's broad policy directives within the policy guidelines, and that Regent's presidents are not permitted to take any unauthorized action.

A former Regent president, David J. Gyertson, testified that Regent's administration had opposed the concept of permanent

tenured employment since the university was founded. Gyertson stated that the continuing contract was structured to provide financial security to a faculty member, in the event that Regent terminated the contract during its three-year duration. Adelia Robertson, a Board member since Regent's founding, testified that the continuing contract was not a guarantee of permanent employment, and that Regent had never had a "tenure" system.

Gyertson also testified that Regent's president did not have the authority to change the university's "foundational" policies, especially those related to the Board's role in setting the terms and conditions of employment contracts. Gyertson stated that his job as president was to apply the policies of the Board, and that if adjustments were necessary, he was "under mandate to bring those changes to the [B]oard."

Professor Kelly stated that he was not aware of the Slosser letter before the litigation began. Although Professor Tuomala stated that he had read the Slosser letter, he also testified that he began teaching at Regent about two years before the letter was written. The record is silent regarding Professor Waller's knowledge of the letter.

Professor Kelly stated that he could not remember whether, during his initial employment interview, the Dean of the College of Communications and the Arts had represented the university's employment policy as "continuing" or "tenured." Professor Tuomala did not recall the exact words used in his interview, but

said that he came away with an understanding that Regent had "some sort" of tenure. Finally, Professor Waller testified that when she raised the issue with the Dean of the College of Communication and the Arts, he stated that the continuing contract was essentially a "tenure contract" and that she would be "secure." The professors all left other employment positions to work at Regent.

Relying in part on the testimony presented, the trial court ruled that the contracts did not provide permanent tenured employment, but merely afforded financial security to a professor who might no longer be acceptable to the university, or who might wish to terminate his employment with the university. The court ruled that Regent was bound to honor the remaining two years of the three-year faculty contracts, but that Regent was not under any obligation to renew the contracts under identical terms. Finally, the court ruled that the tenure policy statements made to the ABA were at variance with Regent's policy, and that these representations were made without knowledge or authorization by the Board, which "makes the policy."

On appeal, the professors primarily argue that the trial court disregarded the unambiguous language of the faculty contracts which promised annual renewal, absent breach of contract by the professors. The professors also advance an alternative argument that, even if the contract language is ambiguous, the trial court erred in admitting certain parol

evidence.  We disagree with both contentions.

We first address the issue whether the contract language is ambiguous.  The question whether a writing is ambiguous is one of law, not of fact.  Langman v. Alumni Ass'n of the Univ. of Virginia, 247 Va. 491, 498, 442 S.E.2d 669, 674 (1994); Wilson v. Holyfield, 227 Va. 184, 187, 313 S.E.2d 396, 398 (1984).  Thus, we are not bound by the trial court's conclusions on this issue, and we are permitted the same opportunity as the trial court to consider the contract provisions.  Langman, 247 Va. at 498, 442 S.E.2d at 674; Wilson, 227 Va. at 187-88, 313 S.E.2d at 398.

We hold that the language of the faculty contracts is ambiguous.  "An ambiguity exists when language admits of being understood in more than one way or refers to two or more things at the same time."  Amos v. Coffey, 228 Va. 88, 92, 320 S.E.2d 335, 337 (1984) (quoting Renner Plumbing v. Renner, 225 Va. 508, 515, 303 S.E.2d 894, 898 (1983)).

The faculty contracts specify that the professors were entitled to a "three-year continuing contract," as explained in the faculty handbook.  However, the handbook states only that a professor receiving an appointment under a continuing contract is entitled annually to a "new contract," rather than renewal of the professor's existing contract.  From our reading of these provisions, it is unclear whether the faculty contracts entitle the professors to renewal of identical three-year continuing contracts, or whether the contracts annually entitle them to new,

- 7 -

but potentially different, contracts.

Having found that the contract language is ambiguous, we next consider the trial court's admission of certain parol evidence, as well as its factual findings. When the language of a contract is ambiguous, parol evidence is admissible, not to contradict or vary contract terms, but to establish the real contract between the parties. Reed v. Dent, 194 Va. 156, 163, 72 S.E.2d 255, 259 (1952). The construction of an ambiguous contract is a matter submitted to the trier of fact, who must examine the extrinsic evidence to determine the intention of the parties. Cascades North Venture Ltd. Partnership v. PRC Inc., 249 Va. 574, 579, 457 S.E.2d 370, 373 (1995); see Greater Richmond Civic Recreation, Inc. v. A. H. Ewing's Sons, Inc., 200 Va. 593, 596, 106 S.E.2d 595, 597 (1959).

We hold that the trial court did not err in considering evidence from present and former Regent Board members regarding the Board's intent as expressed in the faculty contracts. The Board is Regent's policy making body and was a party to the contracts. Thus, the trial court was entitled to give the Board members' testimony great weight in determining the Board's intention. See Am. Realty Trust v. Chase Manhattan Bank, 222 Va. 392, 403, 281 S.E.2d 825, 831 (1981).

We review the evidence in the light most favorable to Regent, the prevailing party at trial. RF&P Corp. v. Little, 247 Va. 309, 319, 440 S.E.2d 908, 915 (1994); Ravenwood Towers, Inc.

<u>v. Woodyard</u>, 244 Va. 51, 57, 419 S.E.2d 627, 630 (1992).  Since the trial court heard the evidence ore tenus, its findings based on an evaluation of the testimony are entitled to the same weight as a jury's verdict.  <u>RF&P Corp.</u>, 247 Va. at 319, 440 S.E.2d at 915.  Thus, the trial court's decision will be upheld unless it appears from the evidence that the judgment is plainly wrong or unsupported by the evidence.  Code § 8.01-680; <u>Langman</u>, 247 Va. at 498, 442 S.E.2d at 674.

The evidence showed that only the Board has the authority to set Regent's policy.  M.G. Robertson, Adelia Robertson, and Gyertson all testified that the Board had opposed the concept of permanent tenured employment throughout Regent's history and had been unaware until late 1993 that any Regent employee had made contrary representations concerning Regent's policy.  In addition, the professors themselves did not state that they were told that the faculty contracts offered permanent tenured positions.  Thus, the trial court's ruling that the faculty contracts did not provide permanent tenured employment is supported by the evidence.[2]

Next, we find no merit in the professors' argument that

---

[2]Since the trial court's ruling is supported by the evidence without resort to the language of the handbook preface, we need not consider the court's preliminary ruling that the contracts incorporated this language.

Regent was bound, under agency principles, by the tenure policy representations made by Regent administrators. As stated above, the record does not show that the professors were offered permanent tenured positions when they negotiated their faculty contracts. Further, since the professors did not testify that they relied on Slosser's or Titus's statements in entering into their faculty contracts, those statements did not bind Regent with respect to the professors' claims.

We also find no merit in the professors' other claims, which are based on theories of equitable and promissory estoppel. To establish a claim of equitable estoppel, without proving fraud, the complainant must show that he reasonably relied on the representations and conduct of the defendant, such that he changed his position to his detriment. Stewart v. Lady, 251 Va. 106, 113, 465 S.E.2d 782, 785 (1996); T . . . v. T . . ., 216 Va. 867, 872-73, 224 S.E.2d 148, 152 (1976).

The doctrine of equitable estoppel is not available unless the party advancing the claim can show that he has acted in reliance upon an action or statement of the party he seeks to bind. Khoury v. Community Memorial Hosp., Inc., 203 Va. 236, 243, 123 S.E.2d 533, 538 (1962). As stated above, the professors' own testimony showed that they were not promised permanent tenured employment by Regent administrators, and that they did not act in reliance on Slosser's or Titus's representations.

Turning to the claim of promissory estoppel, we first note that we have not applied the doctrine in this Commonwealth. <u>Stone Printing and Mfg. Co. v. Dogan</u>, 234 Va. 163, 165, 360 S.E.2d 210, 211 (1987).  Moreover, promissory estoppel is an equitable doctrine which generally is used to imply a contract where none exists.  <u>Dickens v. Quincy College Corp.</u>, 615 N.E.2d 381, 386 (Ill. App. Ct. 1993).  Thus, the doctrine would not apply here because the parties made an enforceable contract.

For these reasons, we will affirm the trial court's judgment.

<u>Affirmed.</u>